MORRIS & CUMMINGS DREDGING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9596.   Promulgated January 28, 1928.

*John M. Enright, Esq.*, for the petitioner.
*J. E. Marshall, Esq.*, for the respondent.

**OPINION.**

LANSDON: One of the chief difficulties encountered in redetermining the tax liability of petitioner is due to the fact that the current books did not reflect the total cost of assets acquired by petitioner, resulting in part from an arbitrary write-off, about 1905, of some $1,000,000. The books reflecting the cost of assets and the write-down were lost at the time of the Commissioner's examination and were found only after the deficiency herein asserted had been determined. The books and records for 1896 and subsequent years were presented at the hearing, together with copies of accounts from 1890 to 1896. On the basis of these new records the petitioner seeks to restore to the capital account the proper entries.

The first of these entries is that representing the cost of the Pamrapo property. This property represented the purchase of certain shore lands in Jersey City for $50,000, and the subsequent acquisition of a lease of land under water in front of such property and the cost of filling in such land to a point above the water level. The account in respect to this property stood on the books at January 1, 1896, at an amount of $272,644.02. Of this amount $65,158.30 consisted of interest on notes and mortgages and rental paid to the State, leaving a net cost of $207,485.72. The petitioner alleges that even this amount did not adequately express the entire cost of the

property, and in support of such contention introduced the testimony of a witness who submitted an estimate of the cost of building the cribwork, the trestle for handling the fill, the cost of handling material, and the cost of construction and equipment of the hoister, amounting to a total of $217,720.93, which, if added to the cost of the shore land of $50,000, would result in a total estimated cost of $267,720.93. We have examined the retrospective appraisal of the cost of filling this property and are of the opinion that it represented nothing more than a very rough estimate without value except insofar as it tends to confirm the cost as shown by the books at January 1, 1896, less the interest and rentals. We are, therefore, of the opinion that the amount of $207,485.72 may be accepted as representing the cost of the Pamrapo property to the petitioner and should be restored to invested capital.

The second property, known as the Point Breeze property, was acquired under an agreement whereby petitioner was required to fill in certain lands under water and after the work was completed to receive one-half of such lands in payment for the services thus rendered. The books of account showed merely the costs to the petitioner of doing such work and were carried on the books at January 1, 1896, in an amount of $260,440.59. Petitioner maintains that it is entitled to include in its earned surplus an amount in excess of such sum and equal to the fair market value of the property acquired on the date of such acquisition.

Petitioner undertook to perform certain services in the way of building crib work, trestles and filling in the property and in consideration for such services it was to receive payment in the form of real estate and property covered by lease. Since this was a transaction which normally would have resulted in the computation of a profit or loss to the petitioner, we believe that the petitioner's contention is well founded—that it should be entitled to set up as cost of the property thus acquired its fair market value on the date of payment.

In support of the value of such property petitioner introduced a witness who was thoroughly familiar with riverside frontages and developments and who, after an examination of all the transactions in the neighborhood, placed a value of $350,000 upon this property. It also introduced testimony of witness Snell, who made a retrospective appraisal of the cost of filling in the lands under the agreement with the Curries and the Point Breeze Ferry & Improvement Co., which amounted to some $313,000.

The testimony of expert witness Gaddis, who placed a value of $350,000 upon this property, was predicated upon an area of 79.71 acres. The testimony introduced indicates that the petitioner

acquired only 76.691 acres. Gaddis stated that if the acreage which he adopted was incorrect the total value of $350,000 should be reduced pro rata to arrive at the correct value. This amount we have determined to be $337,000. We are therefore of the opinion that the value of the Point Breeze property on the date acquired was $337,000, which amount should be restored to the property account on the books of petitioner in lieu of the amount of $10,000, at which this property and the Pamrapo property were carried in the accounts.

A somewhat similar situation is encountered in the plant account. In December, 1905, the plant account stood on the books of petitioner at approximately $393,000. This amount was arbitrarily written down at that time to $201,200, and constituted the basis for the plant account in the current books. Petitioner now seeks to restore the amounts written off in 1905 and also excessive depreciation charged off in 1893 and 1894.

As stated in the findings of fact, the opening entries for the plant account in 1896, were based upon an appraisal of the scows and dredges then owned by the petitioner. Petitioner has no records to show the cost of any of the items contained in the appraisal except scows *Nos. 37, 38, 39,* and *40.* A large number of the scows and all of the tugs and dredges contained in that appraisal were either lost, destroyed, or parted with prior to the taxable years and therefore could not enter into the computation of invested capital. From the books of account and the records submitted the actual cost of certain of the scows and dredges is ascertainable. Petitioner is entitled to restore costs of such items to the plant account in lieu of the amount of $201,200, at which they were carried on the books in 1905, and all of such costs, together with subsequent costs of equipment, should be considered in computing invested capital for the taxable years involved and a depreciation reserve should be set up, based upon the total expected life of each item and the life expired up to the taxable year.

The petitioner alleges error in that respondent has failed to compute its tax liability under the provisions of sections 327 and 328 of the Revenue Act of 1918. It does not appear, however, that prior to the hearing of this proceeding it ever made any application for such relief, and that such application was denied. Nor is it clear whether this issue is presented as an alternative contention or as a primary allegation of error. In any event, we are of the opinion that our findings of fact and decision remove any abnormalities prejudicial to the petitioner, and special assessment is denied.

On March 1, 1913, petitioner owned various scows and dredges which it claimed were in serviceable condition. It is asking for a value at March 1, 1913, of this property for the purpose of depre ia-

tion. In support of its claim it presented the testimony of Leary, who is an officer in the company, and Seely, who was qualified as an expert on the valuation of this type of water equipment. Leary placed a value on each of the scows and dredges in question, which he testified represented the cost of a new piece of property on March 1, 1913. Seely assigned certain values to the various scows based apparently entirely upon the capacity or size of the scow without regard to its age or physical condition. This is made apparent by the fact that he testified that 15 of these scows were lying sunk on or near the property at the time of his inspection. There is a considerable difference between the values assigned to these scows by the appraisal of 1892 and the cost of the scows as shown by the records, as compared with the appraisal of Leary and Seely, and there is considerable difference between the appraisals of Leary and Seely in respect to about 15 of the scows in question. It is not clear as to what basis Seely used in arriving at his values. At one point in his testimony he said the starting point was the cost new of such scows. From a comparison between the actual cost of scows as shown by the books of petitioner and the values assigned to such scows at March 1, 1913, by Seely, it would appear that, for the most part, the values assigned by Seely represented reconstructive cost new. After a consideration of the 1892 appraisal, costs as shown by the records, and the values assigned to the scows by Leary and Seely, we arrived at the March 1, 1913, values as set forth in the findings of fact.

The testimony relating to the value of dredges was somewhat different. Seely had occasion to go aboard and examine one of the dredges, *No. 7*, in 1912 for the purpose of arriving at a value for certain clients of his who wished to purchase the dredge. He also went aboard the dredge *America* in 1926, in order to estimate its value for the purpose of purchase by outside parties. He also visited, in 1927, certain other of the dredges and placed a value thereon as of March 1, 1913. After a comparison between the testimony of Leary and Seely and the cost of such dredges as are of record, we arrived at the values set forth in the findings of fact. Petitioner is entitled to a deduction for each of the years in question, based upon the March 1, 1913, value and the life remaining as of that date.

Subsequent to March 1, 1913, the petitioner acquired by purchase scows *Nos. 53* and *54*. The witness testified that these scows cost approximately $36,000 each. However, petitioner's books show that the only additions to capital account in the year 1914 amounted to $66,979.35. Therefore, this amount should be assigned as the cost of scows *Nos. 53* and *54*, and depreciated on the basis of a 30-year life.

In 1916 petitioner purchased a seagoing tug, named *Taylor*, for $60,000. It utilized this tug for hauling its scows out into the bay

for approximately 3 years, at which time it appeared that the tug was not sufficiently sturdy for that type of work and thereafter it was utilized for harbor work exclusively. In September, 1924, this tug was burned and was a total loss. Petitioner, however, recovered insurance to the amount of $25,000. In the report of the casualty the Morris & Cummings Dredging Co., by R. H. Ballou, superintendent, estimated the value of the vessel at $35,000. Petitioner claims that the reasonable life of the tug *Taylor* on the date of the purchase in 1916 was 7 years and desires to write off one-seventh of the cost thereof each year. During the years 1916, 1917, 1918, 1919, and 1920, petitioner wrote off depreciation on its books in an amount of $4,500 a year, which is a rate of 7½ per cent.

In view of the fact that the petitioner during the years 1916 to 1920 considered that the reasonable life of the tug was 13⅓ years, and since it was able to insure this tug in 1924 for $25,000 and estimated its value on that date at $35,000, we fail to see any justification for allowing a rate in excess of that taken by petitioner during the years in question. We are therefore of the opinion that petitioner is entitled to a depreciation rate of 7½ per cent for the years 1918, 1919, and 1920, based upon a cost of the tug *Taylor* of $60,000.

The petitioner also claims that for the year 1920 it should be allowed extraordinary depreciation on account of the fact that it operated its plant at capacity during that year and did not have time to make adequate repairs. This contention is not sustained by its records, which show that during the year 1920 the repairs amounted to 17.9 per cent of the total earnings, while for the year 1919 they amounted to only 12.7 per cent. Furthermore, it does not appear to us that the use of petitioner's plant at capacity resulted in any additional depreciation upon the hulls of the vessels used. Since testimony has been introduced to show that depreciation is greater if the plant remains idle and on the surface than when in constant use, and since under normal conditions excessive use of plant and equipment merely results in additional wear and tear on the machinery with very little, if any, additional wear upon the hulls of the vessels, we are of the opinion that petitioner has failed to show that it is entitled to depreciation for the year 1920 in excess of the normal rates determined.

Petitioner alleges that the deficiency for 1918 is barred by the statute of limitations. The only evidence submitted in respect to this issue consisted of two waivers, one of which was dated December 8, 1924, and the second February 17, 1925, and also a certain receipt for payment of taxes, dated June 11, 1924, a certificate of overassessment dated May 13, 1924, and an assessment list of February, 1924. Nothing was submitted to show the date when the return was filed. However, even assuming that the return was filed more than five years

prior to December 8, 1924, we are of the opinion that on account of the waivers filed the statute had been extended to December, 1925, and that the Commissioner was therefore not barred by statute in asserting a deficiency as of October, 1925, at which time the 60-day letter was mailed to petitioner. The circumstances in this case have previously been passed upon in the case of *Joy Floral Co.*, 7 B. T. A. 800.

Petitioner also alleges that the Commissioner was not justified in reducing invested capital during each of the years in question by deducting income and profits taxes due for each of the prior years. Nothing has been submitted in support of this claim other than the 60-day letter above referred to. An examination of this letter does not disclose that any deduction of the character indicated has been erroneously made.

*Judgment will be entered on 15 days' notice, under Rule 50.*